UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

**UNITED STATES OF AMERICA**

v.                                    CRIMINAL ACTION NO. 2:09-00235

**MARK A. STATEN**

<u>MEMORANDUM OPINION AND ORDER</u>

Pending are defendant's motion to dismiss, filed December 15, 2009, and the United States' motion to seal its memorandum of law in response to the court's February 26, 2010, order, filed April 29, 2010.

Inasmuch as the United States, on May 7, 2010, filed a revised version of the memorandum of law for which it sought a sealing order, and that the redactions found therein are appropriate, it is ORDERED that the motion to seal be, and it hereby is, granted as to those portions of the memorandum of law that have been redacted and denied in all other respects.

I.

On September 20, 2007, defendant was convicted in the Magistrate Court of Kanawha County ("magistrate court") of committing domestic battery in violation of W. Va. Code § 61-2-

28.  On December 17, 2008, he was convicted on two separate charges of committing domestic assault in violation of section 61-2-28b.  Defendant's wife, Angela Staten, was the victim in each instance.  The three crimes qualify as misdemeanor domestic violence offenses pursuant to 18 U.S.C. § 921(a)(33).

At all material times, defendant resided with Ms. Staten and his stepson at 112-C Cicerone Star Route in Sissonville.  On April 7, 2009, he was serving a term of probation arising from the December 17, 2008, domestic assault convictions.  (Pretr. Servs. Rep. at 4).  The United States asserts, and defendant does not dispute, that a condition of his probation prohibited him from possessing firearms.  On that date, two deputies with the Kanawha County Sheriff's Department were dispatched to the home to investigate a domestic disturbance.  When they arrived, Ms. Staten reported that she and defendant had been arguing for two days.  She told the two deputies that defendant was in the bedroom and that she had feared for her safety inasmuch as he was intoxicated.  She also advised that firearms were hanging on the wall in the living room of the home.

The two deputies entered the residence, and then the living room, and noticed two rifles and one shotgun hanging on the wall.  The three firearms are identified as follows: (1) a

Rossi .17 caliber single shot rifle, (2) a Rossi .410 caliber single shot shotgun, and (3) a Mossberg model 702 Plinkster .22 caliber semiautomatic rifle.  Defendant asserts that the firearms are "long guns" designed primarily for home defense and hunting. (Mot. to Dism. ¶ B.4).[1]

The two deputies asked defendant to exit the bedroom and enter the living room.  They observed that he had slurred speech, bloodshot eyes, and was emitting an alcohol odor.  After he complied, he told the two deputies that he had previously been convicted for domestic assault.  They confirmed the prior record with the magistrate court, seized the firearms, and arrested defendant for being a prohibited person in possession of a firearm.

Defendant was transported to South Central Regional Jail.  The West Virginia Uniform Incident/Offense Report Form documenting the arrest, and attached to defendant's motion to dismiss, provides pertinently as follows:

> WHILE AT HEADQUARTERS, MR. STATEN STATED TO ME THAT HE KNEW THAT HE WAS NOT TO BE IN POSSESSION OF ANY FIREARMS. HE STATED THAT HE HAD TOLD HIS WIFE THAT, BUT THAT SHE WOULD NOT DISPOSE OF THE WEAPONS.

(Ex. 1, Def.'s Mot. to Dism.).

---

[1] The court understands defendant to contend that he used the firearms for the two identified purposes but, as discussed more fully infra, that section 922(g)(9) impermissibly infringes only upon his Second Amendment right to home defense.  (Compare Def.'s Ltr. to Ct. (noting that the seized firearms "may be used in the home for defensive purposes."), with Def.'s Reply at 4 n.2)).

3

On October 20, 2009, the grand jury charged defendant with unlawfully possessing the aforementioned firearms in violation of 18 U.S.C.§ 922(g)(9) and 924(a)(2) inasmuch as he had previously been convicted of misdemeanor crimes of domestic violence.

On December 15, 2009, defendant moved to dismiss. He contends that section 922(g)(9), both facially and as applied, offends the Second Amendment.

## II.

The Second Amendment provides that "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. Amend 2. In <u>District of Columbia v. Heller</u>, 128 S. Ct. 2783 (2008), the Supreme Court concluded "that the Second Amendment conferred an individual right to keep and bear arms." <u>Id.</u> at 2799. The majority opinion hastened to add, however, that "the right was not unlimited, just as the First Amendment's right of free speech was not . . . ." <u>Id.</u> While the Supreme Court rejected rational basis scrutiny as the appropriate means for adjudicating the constitutionality of regulatory restrictions imposed upon the Second Amendment right, it did not prescribe the appropriate standard of judicial review.

4

The absence of direct guidance on that point from the High Court has resulted in some uncertainty in Heller's wake. The incertitude is compounded by what some view as a categorical carve out for certain firearm regulations:

> Although we do not undertake an exhaustive historical analysis today of the full scope of the Second Amendment, nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.

Id. at 2816-17. The majority opinion referred to these exceptions as a list of "presumptively lawful regulatory measures . . . [that did] not purport to be exhaustive." Id. at 2817 n.26.

Within the past two months, a member of this court summarized the state of the law as it then existed respecting constitutional review of section 922(g)(9) in light of Heller:

> More than a handful of courts have found 18 U.S.C. § 922(g)(9) constitutional simply because it is "similar enough" to the presumptively lawful restriction on firearms possessed by convicted felons, specifically mentioned by the Supreme Court. A few, however, including a growing number in this circuit, have found such an analysis insufficient. See e.g., United States v. Brown, No. 3:09-cr-339, slip op. (E.D. Va. May 27, 2010). This is largely due to an unpublished (and hence non-binding) opinion of the Fourth Circuit Court of Appeals in United States v. Chester, 2010 WL 675261 (4th Cir. Feb. 23, 2010) and a Seventh Circuit Court of

> Appeals decision (now vacated pending <u>en banc</u> review) from which the Fourth Circuit decision took much of its reasoning: <u>United States v. Skoien</u>, 587 F.3d 803 (7th Cir. 2009)[, <u>reh'g en banc granted and opinion vacated by</u> 2010 WL 1267262 (7th Cir. Feb. 22, 2010)].

<u>United States v. Tooley</u>, No. 3:09-00194, 2010 WL 2380878, at *4 (S.D. W. Va. Jun. 14, 2010) (Chambers, J.).  It remains the case, as alluded to in <u>Tooley</u>, that two courts of appeal have deemed section 922(g)(9) constitutional based upon its similarity to the presumptively lawful restriction on felon firearm possession.  <u>See</u> <u>United States v. White</u>, 593 F.3d 1199, 1206 (11th Cir. 2010) ("We see no reason to exclude § 922(g)(9) from the list of longstanding prohibitions on which <u>Heller</u> does not cast doubt."); <u>In re United States</u>, 578 F.3d 1195, 1200 (10th Cir. 2009) (order) ("Nothing suggests that the <u>Heller</u> dictum, which we must follow, is not inclusive of § 922(g)(9) involving those convicted of misdemeanor domestic violence.").

Since the decision in <u>Tooley</u> several other developments have occurred.  The Supreme Court issued its decision in <u>McDonald v. City of Chicago</u>, 130 S. Ct. 3020 (2010).  The decision in <u>McDonald</u> deals primarily with the incorporation of the Second Amendment against the states and provides little guidance on the question presented herein.  Of greater moment is that the decision in <u>Skoien</u>, upon which the court of appeals relied so heavily in <u>Chester</u>, has now been vacated and replaced by an <u>en banc</u> decision.

It is also the case that the United States petitioned prior to Tooley for a panel rehearing of the unpublished and nonbinding Chester decision, and the mandate is consequently stayed. Under these unusual circumstances, the court will apply the analytical framework set forth in the recent en banc decision in Skoien, with some continued reference to Chester as appropriate. In doing so, it is the court's desire to heed the guidance of our court of appeals, while mindful of its reliance upon panel precedent now abandoned by an appellate court sitting en banc.[2]

The court must first ascertain the appropriate level of scrutiny to be used in evaluating the constitutionality of section 922(g)(9). The decision in Skoien provides as follows:

> [W]e need not get more deeply into the "levels of scrutiny" quagmire, for no one doubts that the goal of § 922(g)(9), preventing armed mayhem, is an important governmental objective. Both logic and data establish a substantial relation between § 922(g)(9) and this objective.

United States v. Skoien, No. 08-3770, 2010 WL 2735747, at *3 (7th

---

[2] Aside from the narrow analytical similarity between the earlier and later decisions in Skoien identified infra, the 10-1 en banc decision departs almost entirely from the panel's analysis. Foremost, the decision by the full court abandoned the panel's remand order. That remand order would have put the government to its proof in establishing a reasonable fit between its important interest in reducing domestic gun violence and the means chosen to advance that end.

Cir. Jul. 13, 2010) (emphasis added).  This excerpt from Skoien, much like the panel opinion, is an apparent invocation of an intermediate scrutiny standard for review of section 922(g)(9) challenges.

That middle-ground approach between rational basis and strict scrutiny review appears appropriate, especially in the context of this case.  The core of the Second Amendment right appears reserved to those who are "law-abiding, responsible citizens" who will use the possessed firearm for "their 'natural right of armed defense.'"  Chester, 2010 WL 675261, at *6 (quoting Skoien, 587 F.3d at 812).[3]

Defendant nevertheless appears to assert that strict scrutiny applies based, in part, upon the fact that he ostensibly used the firearms for home defense.[4]  That does not, however, seem to be a sensible approach.  In determining if defendant's possessory right is akin to those that reside at the core, one

---

[3]The panel in Chester likewise concluded that "it [wa]s clear" that the defendant therein was not "law abiding," apparently based upon his prior conviction for two misdemeanor domestic violence offenses arising out of the same incident and a separate, similar offense two years later that resulted in the arrest leading to the section 922(g)(9) charge.

[4]Defendant also contends that the Second Amendment creates a fundamental right warranting strict scrutiny review.  The court rejects the contention based upon the analysis in the en banc Skoien decision and Chester.

must consider the circumstances as a whole and particularly defendant's status at the time of the charged offense.

First, it is undisputed that defendant has three prior convictions for domestic battery.  That fact alone is quite significant in determining the appropriate level of review.  See Tooley, 2010 WL 2380878, at *12 (stating "[T]he Court must conclude that Mr. Tooley's right to carry a firearm is within the scope of Second Amendment protection, but outside of its 'core.'  Mr. Tooley engaged in criminal acts, when he violated Ohio and West Virginia criminal codes defining domestic battery and second offense domestic battery. . . . While constitutional review is necessary, something less than strict scrutiny is appropriate.").

Second, defendant has not challenged the fact that a lawful condition of his probation prohibited him from possessing firearms.  In the court's estimation, that restrictive term of court supervision nudges him entirely outside the core.  See United States v. Knights, 534 U.S. 112, 119 (2001) ("Inherent in the very nature of probation is that probationers 'do not enjoy "the absolute liberty to which every citizen is entitled."'  Just as other punishments for criminal convictions curtail an offender's freedoms, a court granting probation may impose reasonable conditions that deprive the offender of some freedoms enjoyed by law-abiding citizens.") (citation omitted).

Third, defendant does not dispute his statements to law enforcement faulting Ms. Staten for failing to remove the weapons.  This fact, combined with his stated desire to use the firearms as a means for self defense, indicates defendant understood he was encumbered by a diminished expectation of his possessory rights.  Based upon these considerations, the court concludes that defendant's possession of the firearms in this case resides outside the core protections offered by the Second Amendment.  For all of these reasons, there is little basis to infer that strict scrutiny would apply.  Based upon the foregoing, the court concludes that intermediate scrutiny is appropriate.

As noted by the parties, there are different formulations of intermediate scrutiny that have been used by the Supreme Court over the decades depending upon the circumstances and rights involved.  The now-vacated panel decision in <u>Skoien</u>, which the court recognizes is no longer precedent, put it this way:

> [W]e ask whether the government has established that the statute is substantially related to an important governmental interest.  No one questions the importance of the government's interest . . . .  The dispute here is about the fit between this important objective and § 922(g)(9)'s blanket ban on firearms possession by persons who have been convicted of a domestic-violence misdemeanor. Under intermediate scrutiny, the

10

>     government need not establish a close fit between the
>     statute's means and its end, but it must at least
>     establish a <u>reasonable</u> fit.

<u>Skoien</u>, 587 F.3d at 805-06 (emphasis in original).  As noted <u>supra</u>, the <u>en banc</u> decision retains essentially this same formulation.

Examination of the first side of the sliding scale leaves little room for doubt that an important governmental interest is at stake.  <u>See</u> <u>United States v. Salerno</u>, 481 U.S. 739, 749 (1987); <u>see also</u> <u>United States v. Hayes</u>, 129 S. Ct. 1079, 1087 (2009)("Construing § 922(g)(9) to exclude the domestic abuser convicted under a generic use-of-force statute (one that does not designate a domestic relationship as an element of the offense) would frustrate Congress' manifest purpose.  Firearms and domestic strife are a potentially deadly combination nationwide.").

The other side, namely, the presence of a substantial relationship, or reasonable fit, is a bit more involved.  The United States has offered empirical evidence in this case on both the issue of recidivism and the positive correlation between access to firearms and their use against those in a domestic relationship.  Respecting recidivism, the studies cited by the United States offer, <u>inter alia</u>, the following findings: (1) of

11

3,662 suspects arrested for misdemeanor domestic violence in Cincinnati, 17% were arrested for the same offense again during the three-year study; and (2) studies relying upon direct victim interviews, as opposed to police data, indicate recidivism rates from between 40% to 80%.

Regarding the question of gun access and use in the domestic context, the United States offers the following evidence from the literature: (1) an article in the 1993 <u>New England Journal of Medicine</u> shows that "living in a household where someone had previously been hit or hurt in a fight in the home [is] strongly and independently associated with homicide;" (2) a 2003 study in the <u>American Journal of Public Health</u> concluded that "[n]ever having lived with [an] abusive partner significantly lowered women's risk of femicide;" and (3) a 1992 article in the <u>Journal of the American Medical Association</u> reported "clear evidence" that domestic violence involving firearms is 12 times more likely to result in victim death than nonfirearm-related domestic violence incidents.  The <u>en banc</u> decision in <u>Skoien</u> includes further studies drawing a significant link between death or injury by firearms in domestic disputes.  <u>Skoien</u>, 2010 WL 2735747, at *5.

The importance of prohibiting firearm possession by convicted domestic violence misdemeanants is thus not only

12

supported by floor statements in Congress or observations in judicial opinions. It is borne out as well by available statistical evidence in peer reviewed journals.

Despite this apparent necessity for curtailing the Second Amendment rights of those who threaten or harm domestic intimates, defendant contends at some length that section 922(g)(9) sweeps too broadly. As noted in Tooley though, and based upon the settled, binding precedent cited therein, a perfect fit is not required:

> Section 922(g)(9) is of course overbroad in the sense that not every domestic violence misdemeanant who loses his or her right to keep and bear arms would have misused them against a domestic partner or other family member. Under intermediate scrutiny, however, the fit does not need to be perfect, but only be reasonably tailored in proportion to the important interest it attempts to further.FN11 As such, intermediate scrutiny tolerates laws that are somewhat overinclusive. See, e.g.[,] . . . [Board of Trustees of State University of New York v. Fox, 492 U.S. [469,] at 490; Anheuser-Busch, Inc. v. Schmoke, 101 F.3d 325, 327-28 (4th Cir.1996). Moreover, "[s]ound policymaking often requires legislators to forecast future events and to anticipate the likely impact of these events based on deductions and inferences for which complete empirical support may be unavailable." Turner Broadcasting System, Inc. v. F.C.C. 512 U.S. 622, 665, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994).

Tooley, 2010 WL 2380878, at *16.

It is true that section 922(g)(9) cuts a swath. The firearm prohibition could be viewed as essentially existing

13

indefinitely[5], there is no basis for potential restoration of gun rights, and there is no requirement of an individualized future risk assessment that a prohibited misdemeanant would use a gun in a prospective domestic violence setting.  At the same time, Congress added provisions indicative of tailoring.  The phrase "[m]isdemeanor crime of domestic violence" limits section 922(g)(9) to those offenders who actually used or attempted to use physical force or threatened the use of a deadly weapon in a domestic disturbance.

In view of the importance of the governmental interests at issue, and the reach of the statute, the court cannot conclude defendant's Second Amendment rights have been unconstitutionally infringed.  The court, accordingly, concludes that section 922(g)(9), as applied to defendant, is substantially related to an important governmental interest.  Additionally, the United States has established a substantial relationship between the important objectives represented by section 922(g)(9) and the corresponding scope of the restrictions that it imposes.  Further, inasmuch as section 922(g)(9) is not unconstitutional as applied to defendant, his corresponding facial challenge to the

---

[5]The prohibition is arguably not absolute.  Section 922(g)(9) is typically not a barrier to firearm possession if the underlying conviction has been expunged, set aside, or the offender has been pardoned.  18 U.S.C. § 921(a)(33)(B)(ii).

14

statute is meritless.  See Richmond Med. Ctr. for Women v. Herring, 570 F.3d 165, 173 (4th Cir. 2009) (noting that the Supreme Court "has observed that . . . [an] act cannot be found facially unconstitutional if it operates constitutionally in some circumstances.") (citing Salerno, 481 U.S. at 745); Washington State Grange v. Washington State Repub. Party, 552 U.S. 442, 449 (2008)("While some Members of the Court have criticized the Salerno formulation, all agree that a facial challenge must fail where the statute has a 'plainly legitimate sweep.'") (some internal quotation marks omitted)).

### III.

Based upon the foregoing discussion, it is ORDERED that defendant's motion to dismiss be, and it hereby is, denied.

The Clerk is directed to forward copies of this written opinion and order to the defendant and all counsel of record.

DATED: September 2, 2010

_____
John T. Copenhaver, Jr.
United States District Judge